UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SIG SAUER, INC.,
a foreign corporation,

     Plaintiff,

v.                                Case No: 8:21-cv-0194-KKM-SPF

D&M HOLDING COMPANY, LLC,
a Florida limited liability company, DESIGN &
MANUFACTURING HOLDING COMPANY, LLC,
a Florida limited liability company, and
DANIEL L. POWERS, JR.,

     Defendants.

_____

## ORDER

In December 2020, three employees of SIG Sauer, Inc., left to work for D&M Holding Company.[1] But those employees had executed contracts in which they agreed not to have any involvement—even indirectly—with a company that competed with SIG. In response, SIG sued D&M and D&M's CEO, Daniel L. Powers, Jr., alleging that they tortiously interfered with SIG's contractual relationship with those employees. Defendants move to dismiss the action because SIG supposedly fails to plausibly allege three of the five

_____

[1] SIG brings this action against D&M, LLC, and D&M, Inc. (Doc. 18 ¶¶ 2–3.) Because the two defendants appear identical for purposes of this order, the Court refers to them both simply as "D&M."

tortious interference elements. Defendants also contend that SIG fails to plausibly allege that Powers acted outside of his corporate capacity or that D&M was the mere instrumentality of Powers, rendering SIG's claim against Powers inappropriate. The Court disagrees on all points and denies Defendants' Motion to Dismiss.

## I.   BACKGROUND[2]

Beginning in 2012, SIG launched an initiative "to enter the high-end ammunition market and establish a viable ammunition business." (Doc. 18 ¶ 9.) In June 2012, SIG hired D&M as a consultant to assist with SIG's attempt to develop its in-house manufacturing capabilities. (*Id.*) D&M "holds itself out as a global ammunition manufacturing equipment and services integration company." (*Id.* ¶ 2.) As part of its effort to develop in-house manufacturing, SIG hired Powers, the CEO of D&M, on January 1, 2013, to be the director of SIG's Ammunition Division. (*Id.* ¶ 10.) SIG later promoted Powers to be President of the Ammunition Division. (*Id.*)

Between 2014 and 2016, SIG opened a new corporate headquarters in New Hampshire, leased a factory in Kentucky for its ammunition manufacturing, and then opened a new manufacturing factory in Arkansas where it moved its Ammunition Division and its ammunition manufacturing. (*Id.* ¶¶ 11–13.) SIG planned for the factory in Arkansas to be a state-of-the-art facility and "invested millions of dollars and substantial

---

[2] As it must, the Court treats the factual allegations in SIG's Amended Complaint as true and construes them in the light most favorable to SIG. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

time in designing and constructing its new facility." (*Id.* ¶ 14.) As part of that design process, SIG worked with "a regional construction and engineering firm" to renovate the facility, work completed under a non-disclosure agreement. (*Id.*) SIG finished its renovations of the facility on March 17, 2017. (*Id.* ¶ 15.)

In anticipation of the manufacturing facility opening and with ammunition sales increasing, SIG hired new personnel for its Ammunition Division. (*Id.* ¶¶ 16–17.) As part of this hiring wave, SIG brought on Jay Durham and Donald Pile in December 2016, and George Wallace in May 2017. (*Id.*) Each of these individuals signed a "Confidential Information, Non-Solicitation, Non-Competition, Invention Assignment and Arbitration Agreement" prior to starting at SIG. (*Id.* ¶¶ 17–18.) These agreements acknowledged that the employees would have access to confidential information regarding the "Business of the Company," which the contract defined as "the design, testing, development, manufacture, sales, and . . . marketing of firearms . . . and related products including but not limited to elector-optics, ammunition, air guns, and accessories." (*Id.* (second omission in original).) The agreements prohibited the employees from "directly or indirectly[] . . . contract[ing] with, be[ing] an agent of, consult[ing] with, invest[ing] in, advis[ing] or hav[ing] any other involvement in any business . . . [that] is competitive with any aspect of the 'Business of the Company,' anywhere in the United States" for one year following the termination of their employment. (*Id.* ¶ 19 (omissions in original) (emphasis omitted).)

3

Powers ended his time with SIG in 2017, but the other new employees remained for several more years. Powers's employment was terminated in September 2017 after he was confronted with evidence that D&M—his company—had been "soliciting bids" that were "potentially in competition with SIG Sauer." (*Id.* ¶ 20.) But the other employees that SIG hired through its new ammunition initiative—Durham, Pile, and Wallace—remained and worked in the design, manufacturing, and sales of "shell cases, loading machines, projectiles[,] and primers" that were "integral to SIG Sauer's ammunition business." (*Id.* ¶ 22.) While they worked on these matters, they had "unfettered access" to SIG's confidential information, such as the ammunition manufacturing processes that created the signature features for SIG's products. (*Id.* ¶¶ 23–25.) While SIG employed them, these employees also had the opportunity to develop "good will" with the suppliers SIG used to build its in-house manufacturing capability. (*Id.* ¶ 26.)

In 2020, Powers began soliciting Durham, Pile, and Wallace through texts and phone calls to leave SIG and work for D&M. (*Id.* ¶ 27.) In December 2020, Powers made employment offers to both Pile and Wallace. (*Id.* ¶¶ 28–29.) His offer to Pile prohibited Pile from "tell[ing SIG] who you are going to work for" and included a $100,000 signing bonus. (*Id.* ¶ 28.) Powers's offer to Wallace similarly prohibited Wallace from telling D&M the identity of his new employer. (*Id.* ¶ 29.) And, in making his offer to Wallace, Powers acknowledged that Wallace "'signed an agreement' with SIG Sauer" and told

Wallace that SIG might try to use the agreement to "demand [Wallace] tell them where you are going." (*Id.*) But Powers told Wallace that, in Powers's view, "you did not sign a noncompete agreement." (*Id.*)

Durham, Pile, and Wallace all resigned from SIG in December 2020 and went to work for D&M. (*Id.* ¶ 30.) Later that month, SIG sent cease-and-desist letters to each of them as well as to Powers. (*Id.* ¶¶ 30–31.) D&M concluded, however, that the employees were not prohibited from working for D&M and D&M was not prohibited from hiring them. (*Id.* ¶ 31.) SIG filed suit on January 6, 2021, in New Hampshire state court against each of the employees, seeking an injunction against them using or disclosing SIG's confidential information. (*Id.* ¶ 32; Doc. 29-1 at 13.)[3] The New Hampshire court granted SIG a preliminary injunction on May 5, 2021, enjoining the employees from violating their non-compete agreements, disclosing SIG's confidential information, or retaining any hard drive containing SIG's confidential information for one year following the end of their employment with SIG. (Doc. 37-1 at 1, 22.)

While they were employed by SIG, SIG issued the employees laptops. Those laptops showed the employees accessed confidential information and used their laptops' USB connections prior to leaving SIG. (*Id.* ¶ 33.) SIG's logs show that prior to August or

---

[3] The Court may "take judicial notice of court documents without converting a motion to dismiss into a motion for summary judgment." *Cooks v. Walmart Stores, Inc.*, No. 2:13-CV-526-RDP, 2013 WL 5350661, at *1 n1. (N.D. Ala. Sept. 23, 2013) (Proctor, J.); *see Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (taking judicial notice of state court documents).

September of 2020, Wallace and Pile extensively "use[d] . . . external devices with SIG Sauer data."[4] (*Id.*) In August or September of 2020, SIG issued new laptops to Durham, Pile, and Wallace and a review of the laptops indicated that Pile and Wallace accessed "folders and files on multiple occasions beginning in October and continuing through December 22, 2020, and apparently copied them to external USB hard or flash drives." (*Id.*) Upon examination of Wallace and Pile's laptops after they left SIG, both laptops contained "a significant amount of SIG Sauer's confidential and proprietary data . . . and each laptop had evidence of USB connections shortly before they announced their departure." (*Id.*)

SIG initiated this suit on January 26, 2021, bringing a claim against Defendants for tortious interference with a contract based on Defendants' conduct occurring in Florida. (Doc. 1.) On April 1, 2021, SIG filed an Amended Complaint. (Doc. 18.) Defendants move to dismiss the Amended Complaint for failure to state a claim. (Doc. 29.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[4] The Amended Complaint alleges that "Pike" used these external devices. But the Amended Complaint lacks any other mention of a "Pike," and the Court assumes the reference is to Donald Pile.

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Bell Atl. Corp.*, 550 U.S. at 557).

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Id.* at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 570). A claim is plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering the motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

## III.   ANALYSIS

To state a claim for tortious interference with a contract, a plaintiff must allege (1) a contract "to which a plaintiff is a party"; (2) that the defendant knew of that contract; (3) that the defendant intentionally procured a "contractual breach"; (4) that the defendant

lacked "justification or privilege"; and (5) that the plaintiff suffered damages from the breach. *Fernandez v. Haber & Ganguzza, LLP*, 30 So. 3d 644, 646 (Fla. 3d DCA 2010).[5] SIG alleges that Defendants intentionally interfered without justification with SIG's contractual relationships with Durham, Pile, and Wallace ("Employees") and that it suffered the loss of its confidential information and supplier good will as a result. Defendants move to dismiss, contending that SIG fails to plausibly allege intent, lack of justification, or damages.[6] Defendants also move to dismiss Powers from the action, arguing that Powers's alleged conduct took place in his role at D&M and that SIG fails to plausibly allege a theory of alter ego liability. Because the Court concludes that SIG plausibly alleges intent, lack of justification, and damages, and because Defendants fail to provide a sufficient reason to dismiss Powers, the Court denies their Motion.[7]

---

[5] Because the elements for both claims "are substantially similar," the Court relies on authorities interpreting the elements of a claim for tortious interference with a business relationship as well as authorities interpreting the elements of a claim for tortious interference with a contract. *AMG Trade & Distrib., LLC v. Nissan N. Am., Inc.*, 813 F. App'x 403, 406 (11th Cir. 2020) (per curiam),

[6] Defendants also contend in a footnote that SIG fails to plausibly allege a business relationship. But SIG brought a tortious interference with a *contract* claim, not tortious interference with a business relationship. And Defendants fail to show how SIG's allegations that it had contracts with Employees are implausible. (Doc. 18 ¶ 17 ("[E]ach executed the [non-compete and confidential information] Agreement . . . .").)

[7] Because the Court concludes that Defendants' Motion fails on its merits, it does not address SIG's argument that the Court should deny Defendants' Motion for failure to comply with Local Rule 3.01(g). (Doc. 37 at 18.)

### A. Tortious Interference with a Contract

SIG alleges that Defendants tortiously interfered with its contracts with Employees. Defendants contend that SIG fails to plausibly allege intent, lack of justification, or damages. The Court disagrees on each point.

### i. SIG Plausibly Alleges Intent

To state a claim for tortious interference with a contract, a plaintiff must allege that the defendant intended to procure the contract's breach. *See Fernandez*, 30 So. 3d at 646. A defendant does not intentionally procure a breach where "he merely enters into an agreement with [an]other with knowledge that the other cannot perform both it and his contract with the third person." *Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836, 838 (Fla. 2d DCA 2009) (quotation omitted). Instead, a plaintiff must show that the defendant intentionally induced the conduct that constituted the contract's breach. *See MKT Reps S.A. DE C.V. v. Standard Chartered Bank Int'l (Ams.) Ltd.*, 520 F. App'x 951, 954 (11th Cir. 2013) (per curiam) (requiring a plaintiff allege that the defendant had "the intent to cause the result" (quotation omitted)); *see also Mortg. Now, Inc. v. Guaranteed Home Mortg. Co.*, 545 F. App'x 809, 811 (11th Cir. 2013) (per curiam) (concluding that a plaintiff proved its case for tortious interference when it provided evidence that the defendant encouraged third parties to take action inconsistent with their duties toward the plaintiff).

Defendants argue that SIG fails to plausibly allege that they intentionally procured the breach of SIG's employees' contracts. Defendants are mistaken. SIG plausibly alleges that Defendants caused Employees to breach their non-compete agreements and that Defendants intended for Employees to breach. Those allegations suffice at this stage to establish intentional inducement.

First, SIG plausibly alleges that Employees breached their non-compete agreements by working for D&M. SIG's business includes the "manufacture . . . of ammunition." (Doc. 18 ¶ 17.) D&M "holds itself out as a global ammunition manufacturing equipment . . . company." (*Id.* ¶ 2.) The Court can reasonably infer that D&M's line of business includes selling to or servicing companies that use ammunition manufacturing equipment. *See Iqbal*, 556 U.S. at 678. And a company that uses ammunition manufacturing equipment would manufacture ammunition, thus plausibly constituting a business competing with SIG's ammunition manufacturing. The Employees agreed to not have "any . . . involvement," even indirectly, "in any business . . . [that] is competitive with any aspect of [SIG's business]." (Doc. 18 ¶¶ 17, 19 (first omission added).) In alleging that Powers recruited the Employees to work for D&M, SIG plausibly alleges that Defendants induced them to be "involved" at least indirectly with a company that competes with SIG's manufacturing of ammunition. Discovery might reveal that the Employees did not actually breach their agreements, but these allegations plausibly suggest otherwise.

Defendants argue that the allegations that the Employees violated their non-compete agreements by working for D&M are conclusory. (Doc. 29 at 14.) Defendants argue that SIG's allegations that D&M offers "consulting services" to SIG's "competitors" and that D&M uses "Durham, Pile, and Wallace to provide those services to SIG Sauer competitors" are conclusory and vague. (*Id.*) But these are bolstered by, and receive context from, earlier allegations. In the Amended Complaint, SIG alleges that D&M is an ammunition manufacturing equipment company, that SIG is an ammunition manufacturing company, and that the Employees now work for D&M. (Doc. 18 ¶¶ 2, 17, 30.) Those allegations are neither vague nor mere recitations of the elements of tortious interference. *See Iqbal*, 556 U.S. at 681 (concluding that allegations were conclusory because they amounted to "nothing more than a 'formulaic recitation of the elements'" (quotation omitted)).

Defendants also contend that they did not induce the breaches with SIG's contracts because the Employees were predisposed to breach their contracts. (Doc. 29 at 15.) Under Florida law, a contracting party's "predisposition to breach . . . precludes any finding that [the contracting party] was induced to breach by [the defendant]." *Farah v. Canada*, 740 So. 2d 560, 562 (Fla. 5th DCA 1999) (reversing jury verdict because the contracting party was predisposed to breach); *accord Ingenuity, Inc. v. Linshell Innovations Ltd.*, 644 F. App'x 913, 916 (11th Cir. 2016) (per curiam) (affirming summary judgment for defendant

because contracting party was predisposed to breach). Because the Employees would potentially breach their contracts if they sought "nearly any other employment in their given ammunition production fields," Defendants contend the Employees must have been predisposed to breaching their contracts. (Doc. 29 at 15.) Defendants' argument assumes the Employees wanted to leave SIG before Powers recruited them. But Defendants fail to cite anything in the Amended Complaint suggesting that the Employees initially wanted to leave SIG. The mere fact that the Employees might have had a difficult time locating a job in their industry that would not violate their agreements with SIG does not necessarily mean that they were predisposed to breach their contracts with SIG. Instead, "whether [the Employees] were predisposed to breach their [contracts with SIG] is a fact-intensive inquiry inappropriate for resolution at this stage." *Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, No. 6:17-cv-1542-Orl-31DCI, 2018 WL 5279135, at *4 (M.D. Fla. Oct. 24, 2018) (Presnell, J.); *accord Wyndham Vacation Ownership, Inc. v. Miller*, No. 6:19-cv-817-Orl-40EJK, 2019 WL 5394074, at *7 (M.D. Fla. Oct. 11, 2019) (Byron, J.). Defendants may reraise this issue at summary judgment if supported by the record.

Not only does SIG plausibly allege that the Employees breached their contracts, but it also plausibly alleges that Defendants intended to procure these breaches. SIG alleges that Defendants knew about the Employees' contracts, recruited them to come to D&M, and offered—for at least one employee—a signing bonus. These allegations permit the

Court to reasonably infer that SIG intended the Employees to come to D&M, despite the action violating their contracts.

Defendants disagree, contending that SIG fails to plausibly allege that Defendants had knowledge of the Employees' contracts because the allegations are conclusory. (Doc. 29 at 8.) Not so. SIG alleges more than "an unadorned, the-defendant-[knew-about-the-contracts] accusation." *Iqbal*, 556 U.S. at 678. SIG alleges that the D&M's president, Powers, was president of SIG's ammunition division when SIG hired the Employees and that, "as President of SIG Sauer's Ammunition Division at the time Durham, Pile, and Wallace were employed, had actual or constructive knowledge of each of their Agreements." (Doc. 18 ¶ 16, 19–20.) SIG need not provide "detailed factual allegations" of precisely how and when Powers came to know of these contracts—the fact that SIG alleges Powers was president of SIG's ammunition division is sufficient to plausibly allege that he knew of the contracts his subordinates executed and what they required. *Iqbal*, 556 U.S. at 678.

Defendants also contend that these allegations do not constitute a plausible allegation of tortious intent. (Doc. 29 at 13–14.) For one, Defendants argue that the allegations related to Defendants' recruitment "allege nothing more than typical pre-hire conversations and banter." (*Id.* at 13) The Court agrees with Defendants' description but disagrees with their conclusion. Such "pre-hire conversations and banter" show that

Defendants intended to lure the Employees to D&M and away from SIG, which would cause them to breach their non-compete agreements if they engaged in conduct while at D&M prohibited by the agreements (and as discussed above, that is plausible based on the factual allegations). *See Mortg. Now, Inc.*, 545 F. App'x at 811 (concluding that a plaintiff sufficiently proved intent where it demonstrated that the defendant induced action that constituted a breach of contract).

For another, Defendants argue that the allegations do not establish "'the intent to damage the business relationship' of SIG with particular SIG customers." (Doc. 29 at 13.) But SIG alleges tortious interference with a *contract* and the contract was between SIG and its former employees, not SIG and its customers. Although SIG alleged the loss of those customers' goodwill as part of its damages, (Doc. 18 ¶ 41), it consistently alleges that Defendants "intentionally and without justification interfered with SIG Sauer's *contractual* relationship with Durham, Pile and Wallace." (*Id.* ¶ 39 (emphasis added).) SIG sometimes alleges damage to a "business relationship" with the Employees, but it referred to those business relationships as being "evidenced by the Agreements each signed prior to their employment by SIG Sauer." (*Id.* ¶ 35.) And, if those allegations were insufficient to clarify what cause of action SIG brings, the heading of its only count alleges "Tortious Interference with Contract." (*Id.* at 14.) Defendants' argument fails.

14

### ii.   SIG Plausibly Alleges Defendants Lacked Justification

Defendants next argue that SIG fails to plausibly allege that Defendants lacked justification for their interference. As an initial matter, Florida law is unclear as to whether the plaintiff must show the defendant's conduct lacked justification or whether the defendant must show its conduct was justified. *See Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1158 (11th Cir. 2001) ("The answer is far from clear."); *Peacock v. Gen. Motors Acceptance Corp.*, 432 So. 2d 142, 144 n.1 (Fla. 1st DCA 1983) ("Whether the plaintiff must prove lack of justification or the defendant must prove justification is an unsettled issue in Florida."). *Compare Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999) (concluding that the complaint failed to allege why the defendant's conduct was "unjustified"), *with Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 650–51 (Fla. 4th DCA 2020) (noting that a defendant must prove four elements to establish a privilege for tortious interference, which precludes liability for the tort), *and G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1535 (11th Cir. 1985) ("[The defendant] ha[s] the burden to establish that its interference was justified."). The Court need not resolve the issue because, even assuming SIG bears the burden of alleging Defendants lacked justification, it satisfied its burden here.

A defendant's conduct can lack justification if its means are improper. *See Hurchalla v. Lake Point Phase I, LLC*, 278 So. 3d 58, 67 (Fla. 4th DCA 2019) ("[T]he issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." (emphasis omitted) (quoting Restatement (Second) of Torts § 767 (Am. Law Inst. 1979)). Conduct is improper when the interference is not "sanctioned by the rules of the game." *Ins. Field Servs., Inc. v. White & White Inspection & Audit Serv., Inc.*, 384 So. 2d 303, 307 (Fla. 5th DCA 1980) (quotation omitted). In determining whether interference was proper, a factfinder can look to seven factors, including the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff, the "social interests in protecting the freedom of action of the [defendant] and the contractual interests of the other," the "proximity . . . of the [defendant's] conduct to the interference," and the "relations between the parties." *Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001) (quoting Restatement (Second) of Torts § 767 cmt. b). Ordinarily, "physical violence, fraudulent misrepresentation[,] and threats of illegal conduct are . . . wrongful means." *Hurchalla*, 278 So. 3d at 67 (emphasis omitted) (quoting Restatement (Second) of Torts § 767). As an example on the other end of the spectrum, the Eleventh Circuit has also held under Florida law that a defendant can use improper means by recruiting the plaintiff's employees behind the plaintiff's back. *See G.M. Brod & Co.*, 759 F.2d at 1535 (concluding

16

that the defendant's conduct was unjustified where it "arranged for [the plaintiff's] employees to resign and to be employed by [the defendant] on the same day."). Where there is room for "different views" about whether a defendant's interference was proper, "the determination of whether the interference was improper or not is ordinarily left to the jury." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1280 (11th Cir. 2015) (quotation omitted). But where a plaintiff fails "to adequately allege improper methods," a court must dismiss the complaint. *See id.* at 1280–81.

Here, SIG plausibly alleges that Defendants lacked justification in their actions. Specifically, SIG alleges that Defendants' means of recruitment lacked justification because it explicitly conditioned its offers to the Employees on each employee not informing SIG "who [the employee is] going to work for." (Doc. 18 ¶¶ 28, 29.) Defendants contend that there is nothing wrong with "asking a prospective employee not to share details of his new opportunity when giving notice, any more than one might not want to tell a current employer that he is speaking to a prospective employer." (Doc. 29 at 13.) Neither case Defendants cite holds that an offer conditioned on the employee's non-disclosure of his new employer is a justified manner of recruiting employees. *See Networkip, LLC v. Spread Enters., Inc.*, 922 So. 2d 355, 358 (Fla. 3d DCA 2006) (concluding that a defendant was justified in terminating its contract even though termination caused Spread to breach its contract with its customers); *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162

F.3d 1290, 1321–22 (11th Cir. 1998) (concluding that the defendant's interference was justified because it had an ownership share in the party who contracted with the plaintiff). And Defendants offer no argument from which the Court can conclude that there is no room for "different views" on whether Defendants abided by the "rules of the game" in their recruitment. *Duty Free Ams., Inc.* 797 F.3d at 1280 (first quote); *Ins. Field Servs., Inc*, 384 So. 2d at 307 (second quote) (quotation omitted).

Deciding whether Defendants' conduct was justified requires balancing the "importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with." *Heavener, Ogier Servs., Inc. v. R. W. Fla. Region, Inc.*, 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982). One factor a factfinder must consider is the relation of the interferer to the plaintiff. *See Seminole Tribe of Fla.*, 780 So. 2d at 315. Here, the interferers were the former president of a division of SIG's company and that former president's current company. A factfinder could conclude that, in soliciting the Employees to work for D&M, Defendants were the near immediate cause of the Employees' breaches. *See Seminole Tribe of Fla.*, 780 So. 2d at 315 (considering the "proximity . . . of the [defendant's] conduct to the interference" (quotation omitted)). And the Eleventh Circuit has upheld a jury finding a lack of justification where the defendant recruited the plaintiff's employees without telling the plaintiff. *See See G.M. Brod & Co.*, 759 F.2d at 1535. Here, based on the allegations, a factfinder could determine that

Defendants' conduct was impermissible and that they violated the "rules of the game." *Ins. Field Servs., Inc.*, 384 So. 2d at 307 (quotation omitted); *see Baycare Health Sys., Inc. v. Med. Sav. Ins. Co.*, No. 8:07-CV-1222-T-27TGW, 2008 WL 792061, at *6 (M.D. Fla. Mar. 25, 2008) (Whittemore, J.) (adopting the magistrate judge's report and recommendation); *see Mfg. Rsch. Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982) ("[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury." (quoting Restatement (Second) of Torts § 767 cmt. l)). SIG plausibly alleges that Defendants lacked justification in the means it employed in recruiting the Employees. At this stage, those allegations suffice.

### iii.  SIG Plausibly Alleges It Suffered Damages

Finally, to state a claim for tortious interference with a contract, a plaintiff must plausibly allege that the tortious interference caused damages. A plaintiff can recover three types of damages in a claim for tortious interference: (1) "the pecuniary loss of the benefits of the contract"; (2) consequential losses legally caused by the interference; and (3) emotional distress or reputational harm, "if they are reasonably to be expected to result from the interference." *JMA, Inc. v. Biotronik SE & Co. KG.*, No. 12-CV-23466, 2014 WL 12838935, at *1 (S.D. Fla. Nov. 24, 2014) (Seitz, J.) (citing Restatement (Second) of Torts § 774A). But a plaintiff cannot state a claim for tortious interference if his damages

are only nominal. *See Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir. 1994).

SIG plausibly alleges that it suffered damages from Defendants' tortious interference. First, SIG alleges that it was damaged "through the loss or threatened loss of its Confidential Information and trade secrets." (Doc. 18 ¶ 41.) Earlier in its Amended Complaint, SIG alleges that the Employees had access to confidential information during their tenure and that, beginning as early as August 2020, they accessed folders and files containing confidential information and could have transferred them onto external USB drives. (*Id.* ¶ 33.) SIG also alleges that two of the Employees' computers "had evidence of USB connections shortly before [those employees] announced their departure." (*Id.*) And one of SIG's employees who went to work for D&M—although not one whom SIG alleges Defendants tortiously interfered with—"copied the entirety of his work product on the external devices." (*Id.*) As a result, SIG almost certainly hopes to uncover in discovery whether the Employees likewise copied extensive amounts of material prior to their departures.

These allegations permit the Court to reasonably infer that the Employees took confidential information from SIG and gave it to or used it for D&M. Other explanations of the Employees' conduct are available: they could have been merely copying and transferring the data as a part of their work for SIG or potentially for personal archives.

But SIG's allegations that one employee copied all his work product to a USB drive and that two employees used their computers' USB ports shortly before their departure render SIG's allegations that Employees took confidential information plausible. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement . . . .'" (quotation omitted)).

Second, SIG alleges that Defendants' tortious interference damaged SIG's reputation with its suppliers. SIG alleges that each Employee was "in a position to develop good will with [SIG's] suppliers." (Doc. 18 ¶ 26.) Because those Employees now allegedly work for a company that services SIG's competitors, the Court can reasonably infer that those Employees will use the goodwill they developed with SIG's suppliers to SIG's detriment and D&M's benefit. *See Iqbal*, 556 U.S. at 678. The Court can thus, at the allegation stage, reasonably infer an injury to SIG's reputation or good will from the Employees' departures. *See JMA, Inc.*, 2014 WL 12838935, at *1 (noting that damages to a plaintiff's reputation are recoverable for tortious interference).

Defendants contend that SIG fails to plausibly allege damages because it does not plead "specific damages." (Doc. 29 at 15–16.) Defendants assert that SIG's damages "seem speculative, or prospective, or even anticipated, by SIG." (*Id.* at 16.) But the authorities Defendants cite do not require a plaintiff to enumerate the specific damages that it suffered in its complaint. *See Int'l Sales & Serv., Inc.*, 262 F.3d at 1155 (requiring that a plaintiff

allege a business relationship with an identifiable person or group to establish the first element of tortious interference); *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1352 (S.D. Fla. 2006) (Altonaga, J.) (granting the defendant's renewed motion for judgment as a matter of law because the plaintiff failed to prove its damages at trial), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (per curiam); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam) (stating the standard for irreparable harm for injunctive relief). Damages from the loss of confidential information can be difficult to measure prior to discovery and a plaintiff's inability to specify a number in its complaint does not require dismissal. *See Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974) (noting that, in a misappropriation of trade secrets action, the "uncertainty [of damages] should [not] preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown"). If SIG's allegations are accurate—which the Court must assume at this juncture—then its loss of confidential information to a company that sells to or services its competitors is a plausible injury.

### B. Powers Is a Proper Defendant

SIG brings this action against both D&M and Powers and alleges that D&M is a mere instrumentality of Powers. (Doc. 18 ¶ 5.) Defendants move to dismiss SIG's claim as to Powers, arguing that SIG fails to plausibly allege alter ego liability or any allegations

that Powers tortiously interfered with SIG's contracts in his individual capacity. But corporate officers can be held "personally liable for their tortious acts, even if such acts were committed within the scope of their employment or as corporate officers." *First Fin. USA, Inc. v. Steinger*, 760 So. 2d 996, 997–98 (Fla. 4th DCA 2000). The Court need not decide whether it should pierce the corporate veil because SIG can bring a tort action against Powers in his individual capacity.

The law in Florida is "settled." *Scutieri v. Miller*, 605 So. 2d 972, 973 (Fla. 3d DCA 1992) (per curiam). "[If] an officer, director, or agent commits or participates in a tort, whether or not his actions are by authority of the corporation or in furtherance of the corporate business, that individual will be liable to third persons injured by his actions." *Special Purpose Accts. Receivable Co-op Corp. v. Prime One Cap. Co.*, 125 F. Supp. 2d 1093, 1104 (S.D. Fla. 2000) (Gold, J.); *accord First Fin. USA, Inc.*, 760 So. 2d at 997–98.

Nonetheless, Defendants cite cases that they purport immunize a corporate agent from a liability if he was acting within his corporate capacity. They are all inapposite. The first several cases merely hold that, for the same reason that a corporation cannot be sued for tortious interference with a contract when it is a party to the contract, a corporation's agent cannot be sued for tortious interference with a contract when he acts within his corporate capacity and the corporation is a party to the contract. *See Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. 1st DCA 1999); *SIG, Inc. v. AT&T Digital*

23

*Life, Inc.*, 971 F. Supp. 2d 1178, 1199 (S.D. Fla. 2013) (Rosenbaum, J.) ("[A]n agent of a corporate party to the business relationship cannot be held liable for tortious interference if he was acting within his capacity and scope as an agent of the corporation."). The Defendants next cite *Ryan v. Wren*, but this case holds that a corporate agent ordinarily cannot be held liable for a contract its corporate employer executed with another party, irrelevant here where SIG brings a tort claim. *See* 413 So. 2d 1223, 1224 (Fla. 2d DCA 1982).[8]

The Court denies Defendants' Motion to Dismiss Powers from this action.

## IV.   CONCLUSION

SIG brings one count alleging Defendants tortiously interfered with its contracts with Durham, Pile, and Wallace. Defendants move to dismiss, arguing that SIG fails to plausibly allege that Defendants intended to procure the breaches of contract, that they lacked justification, or that SIG suffered damages. Defendants also move to dismiss the Amended Complaint as against Powers individually. The Court concludes that SIG plausibly alleges intent, lack of justification, and damages, and that the tortious interference

---

[8] Defendants also cite two cases that hold that Florida courts lack personal jurisdiction over a nonresident corporate officer unless the plaintiff alleged he "departed from his corporate responsibility," *Intercarga Internacional De Carga, S.A. v. Harper Grp., Inc.*, 659 So. 2d 1208, 1210 (Fla. 3d DCA 1995); *see Frohnhoefer v. Pontin*, 958 So. 2d 420, 422 (Fla. 3d DCA 2007), and a Third Circuit case applying New York law, *Halperin v. Moreno* (*In re Green Field Energy Servs., Inc*), 834 F. App'x 695, 697 (3d Cir. 2020). None of these cases hold that a corporate agent is not liable for his torts if he commits them within his role as a corporate officer.

claim survives against Powers in his individual capacity. Accordingly, the Court **DENIES**

Defendants' Motion to Dismiss. (Doc. 29.)

      **ORDERED** in Tampa, Florida, on February 14, 2022.

Kathryn Kimball Mizelle
United States District Judge